AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❏ Original        ❏ Dup



CLERK'S OFFICE
A TRUE COPY
May 31, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. **24-M-439 (SCD)** |
| 1203 42nd Avenue, Kenosha, WI, and the persons of STEVEN REZMER & JESSICA REZMER, as further described in Attachment A | ) ) ) | **Matter No.: 2024R00031** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:        Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____6-14-24_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.        ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Stephen C. Dries_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*        ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:        _____5-31-24. 1:55 pm_____

*Stephen C. Dri*
*Judge's signature*

City and state:        _____Milwaukee, Wisconsin_____        Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property/Individuals to be Searched and Description of the Premises

1.      1203 42nd Avenue, Kenosha, WI: The property consists of a single-family residence. The residence is a multi-story home located in the north-east lot of a cul-de-sac. The residence has a brick exterior with the numbers "1203" written in black inset into a block between a two-car garage door and a single-car garage door. The residence has a combination of light brick walls and stone walls. The windows were trimmed in white with a dark shingled roof, and concrete driveway which extends to a step leading to the front door.  A black mailbox with "1203" affixed below the box is affixed to a black pole at 42nd Avenue, east of the driveway. The property to be searched includes the residence and all areas accessible to the residence, including any basement or crawl space areas; any curtilage associated with the residence.

2.      The person of STEVEN REZMER (XX/XX/1978) if he is present at the target residence.

3.      The Person of JESSICA REZMER (XX/XX/1977) if she is present at the target residence.

1

# ATTACHMENT B

## Items to Be Seized

The following materials, which constitute evidence of the commission of a criminal offense; contraband; the fruits of crime; or property designed, or intended for use, or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Section 2252:

1.    Cell phones, computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.    Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3.    Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

2

4. In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of any device by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between

3

individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12. Any and all cameras, film, videotapes or other photographic equipment.

13. Any and all visual depictions of minors.

14. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to

4

Case 2:24-mj-00439-SCD    Filed 05/31/24    Page 6 of 43    Document 1

be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

5

e. evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence; \

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h. evidence of the times the electronic storage device was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

k. contextual information necessary to understand the evidence described in this attachment.

17. Records and things evidencing the use of the Internet Protocol addresses to communicate with the internet, including:

a. routers, modems, and network equipment used to connect electronic storage devices to the Internet;

b. records of Internet Protocol addresses used; and

c. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

6

including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

During the execution of the search of the premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of STEVEN REZMER and/or JESSICA REZMER to the Touch ID sensor of device(s) or scan for facial recognition, such as an iPhone. Android, or Tablet, found at the premises for the purpose of attempting to unlock the device via fingerprint or facial recognition in order to search the contents as authorized by this warrant. If facial recognition is required, the subject(s) will remain still and look, with eyes open, at the camera for any devices seized in connection with this warrant for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.



CLERK'S OFFICE
A TRUE COPY
May 31, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1203 42nd Avenue, Kenosha, WI, and the persons of<br>STEVEN REZMER & JESSICA REZMER, as further<br>described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 24-M-439 (SCD)

**Matter No.: 2024R00031**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §2252(a)(2) and 2252(a)(4)(B) | Distribution of child pornography, and possession of child pornography. |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Gartland, FBI SA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 5-31-24

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF AN**</u>
<u>**APPLICATION FOR A SEARCH WARRANT**</u>

I, Daniel Gartland, being first duly sworn, depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I have been employed as a Special Agent of the FBI, since May 2018, and am currently assigned to the Milwaukee Division as a member of the Milwaukee Child Exploitation and Human Trafficking Task Force. While employed by the FBI, I have investigated federal criminal violations related to child exploitation, and child pornography. I have received training to investigate child pornography and child exploitation crimes and have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256) in different forms of media including computer media.   As a result of my training, experience, and discussions with other law enforcement officers assigned to investigate child pornography and child exploitation, I am familiar with methods by which electronic devices are used as the means for receiving, transmitting, possessing, and distributing images and videos depicting minors engaged in sexually explicit conduct. I have also received training and gained experience in interview and interrogation techniques with enhanced training specific to cybercrimes, social media search warrants, residential search warrants, interviews, and interrogations of subjects of criminal investigations, as well as electronic device identification and forensic review.

2.      The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider truthful and reliable.

3.      Based upon the information described below, I submit that probable cause exists to believe that an unidentified subject(s) residing at 1203 42nd AVENUE, KENOSHA, WI 53144

1

(SUBJECT PREMISES) has/have committed the crimes of distribution of child pornography in violation of Title 18, United States Code, Section 2252(a)(2), and possession of child pornography in violation of Title 18, United States Code, Section 2252(a)(4)(B). I further submit that evidence relating to this crime, more particularly described in Attachment B, can be found in the SUBJECT PREMISES more particularly described in Attachment A.

4.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**DEFINITIONS**

5.    The following definitions apply to the Affidavit and Attachment B to this Affidavit:

   a.  "Child Pornography" (also known as "Child Sexual Abuse Material") is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

   b.  "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

   c.  The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

2

d.  An "Internet Protocol address" (IP address) is a unique numeric address used by internet-enabled electronic storage devices to access the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every electronic storage device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that electronic storage device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static that is, long-term IP addresses, while other computers have dynamic that is, frequently changed IP addresses.

e.  "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

f.  The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including writings and drawings), photographic form (including prints, negatives, videotapes, motion pictures, and photocopies), mechanical form (including printing and typing) or electrical, electronic or magnetic form (including tape recordings, compact discs, electronic or magnetic storage devices such as hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, smart cards, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

g.  "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

3

h. "Visual depictions" include undeveloped film and videotape, and data stored on a computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

i. "Website" consists of text pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

j. "Peer to Peer file sharing" is a method of communication available to internet users through the use of widely available software. There are several different software applications that can be used to access different P2P networks and these applications operate in essentially the same manner. Computers linked together through the internet using this software form a network that allows for the sharing of digital files between users on the network.

**ELECTRONIC STORAGE DEVICES AND FORENSIC ANALYSIS**

6.      I am aware through training, experience, and consulting with other law enforcement agents/analysts with specialized knowledge and training in computers, networks, and Internet communications that to properly retrieve and analyze electronically stored (computer) data, and to ensure accuracy and completeness of such data and to prevent loss of the data either from accidental or programmed destruction, it is necessary to conduct a forensic examination of the electronic storage devices.  To ensure such accuracy and completeness, it may also be necessary to analyze not only the electronic storage devices, but also peripheral devices which may be interdependent, the software to operate them, and related instruction manuals containing directions concerning operation of the device computer and software.  As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the proposed search location, in whatever form they are found.  One form in which the records might

4

be found is stored on a computer's hard drive, other storage media, within a hand-held electronic device such as a cellular telephone or a tablet device (e.g., an iPad device). Some of this electronic information, as explained below, might take a form that becomes meaningful only upon forensic analysis.

7. Based on my knowledge, training, and experience, I know that computer and other electronic device hardware, peripheral devices, software, documentation, and passwords may be important to a criminal investigation in three distinct and important respects.

   a. The objects themselves may be instrumentalities used to commit the crime;

   b. the objects may have been used to collect and store information about crimes (in the form of electronic data); and

   c. the objects may be contraband or fruits of the crime.

8. I submit that if a computer or other electronic storage device is found on the premises, there is probable cause to believe those records will be stored in that electronic storage device, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that electronic storage device files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person deletes a file on an electronic storage device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. It follows that deleted files, or remnants of deleted files, may reside in free space or slack spaceCthat is, in space on the storage medium that is not currently being used by an active file for long periods of time before they are overwritten. In addition, if the electronic storage device uses an operating system (in the case, for example, of a computer,

5

cellular telephone, or tablet device) the device may also contain a record of deleted data in a swap or recovery file.

b.  Wholly apart from user-generated files, electronic storage device storage media in particular, computers' internal hard drives, contain electronic evidence of how the device was used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, and file system data structures. Electronic storage device users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information.

c.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or cache.  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

9.  As further described in Attachment B, this application seeks permission to locate not only electronic storage device files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic storage devices were used, the purpose of their use, who used them, and when.

10.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), electronic storage device storage media can contain other forms of electronic evidence as described below:

a.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional

6

information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the electronic storage device was in use. Electronic storage device file systems can record information about the dates files were created and the sequence in which they were created.

b. As explained herein, information stored within an electronic storage device and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within an electronic storage device (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the electronic storage device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the electronic storage device was remotely accessed, thus inculpating or exculpating the electronic storage device owner. Further, electronic storage device activity can indicate how and when the electronic storage device was accessed or used. For example, as described herein, computers typically contain information that logs computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within an electronic storage device may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer or cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The

7

existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera). The geographic and timeline information described herein may either inculpate or exculpate the electronic storage device user. Last, information stored within an electronic storage device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information within the electronic storage device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the electronic storage device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Whether data stored on an electronic storage device is relevant to the investigation may depend on other information stored on the electronic storage device and the application of knowledge about how an electronic storage device works. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

d. Further, in finding evidence of how an electronic storage device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner.

11. Based upon my knowledge, training and experience, and after having consulted with FBI computer forensic personnel, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled

8

environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some electronic storage device equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how an electronic storage device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

b. The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c. Technical requirements. Electronic storage devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of electronic storage device hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

9

d.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

12.  In light of these concerns, I hereby request the Court's permission to seize the electronic storage devices, associated storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

13.  I know that when an individual uses a computer to commit crimes involving child pornography, the individuals' computer and/or electronic devices will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic storage device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  From my training and experience, I believe that an electronic storage device used to commit a crime of this type may contain data that is evidence of how the electronic storage device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

**BIOMETRIC ACCESS TO DEVICES**

14.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features.

10

Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

15. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

16. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyze, and record data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

17. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the

11

registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

18. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

19. As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

20. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric

features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

21. As part of this investigation your affiant has determined that STEVEN REZMER and JESSICA REZMER aka JESSICA CORCORAN are the owners of the residence your affiant seeks to search and both have lived at that residence during the relevant time periods Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request authority for law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of STEVEN REZMER and/or JESSICA REZMER aka JESSICA CORCORAN to the fingerprint scanner of the devices found at the SUBJECT PREMISES, or on STEVEN REZMER's person or on JESSICA REZMER's aka JESSICA CORCORAN's person; (2) hold the devices found at the SUBJECT PREMISES, or on the person of STEVEN REZMER and or the person of JESSICA REZMER aka JESSICA CORCORAN in front of STEVEN REZMER's face and/or JESSICA REZMER's aka JESSICA CORCORAN's  face to activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT PREMISES, or on the person of STEVEN REZMER and/or on the person of JESSICA REZMER aka JESSICA CORCORAN in front of STEVEN REZMER's face and/or  JESSICA REZMER's aka JESSICA CORCORAN's face and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

**BACKGROUND ON PEER-TO-PEER FILE SHARING**

22. A significant aspect of the internet, as it relates to this investigation, is peer to peer (P2P) file sharing. P2P file sharing is a method of communication available to internet users through the use of widely available software. This investigation focuses on the P2P network called

13

BitTorrent. There are several different software applications that can be used to access these different P2P networks and these applications operate in essentially the same manner. Computers linked together through the internet using this software form a network that allows for the sharing of digital files between users on the network.

23. These P2P networks are commonly referred to as decentralized networks because each user of the network is able to distribute information and queries directly through other users of the network, rather than relying on a central server to act as an indexing agent, where all of the information is first deposited before it is distributed.

24. To access the P2P networks a user must first obtain the required P2P software; this software can be downloaded for free from the internet. In general, P2P software allows the user to set up files on a computer to be shared with others running compatible P2P software. When the P2P software is installed on a computer, the user is directed to specify a "shared" folder. All files placed in that user's "shared" folder are available to be shared with and downloaded by any other user connected to the P2P network. Therefore, a user needs simply to move a file from one folder to another to stop the distribution across the internet. Further, once a file or files are placed in a shared folder the distribution of that file(s) is dependent only on the machine being turned on and connected to the internet.

25. The BitTorrent network is a very popular and publicly available P2P filesharing network. Most computers that are part of this network are referred to as "peers" or "clients." A peer/client can simultaneously provide files to some peers/clients while downloading files from other peers/clients. The BitTorrent network can be accessed by peer/client computers via many different BitTorrent network client (software) programs, including uTorrent, Vuze, Deluge,

14

qBittorrent, and others. These are publicly available and typically free P2P client software programs that can be downloaded from the internet.

26. BitTorrent sets up its searches by keywords typically on torrent websites. The results of a keyword search are displayed to the user. The website does not contain the files being shared, only the file referred to as a "torrent." A torrent file defines the files being shared and contains file names, file sizes, file paths, the total number of pieces, the size of each piece, the SHA-1 hash value of each piece, and the torrent type (public or private). The torrent file does not contain the desired content; it simply defines what is available. A user may then select a torrent file(s) from the search results for download. For example, a person interested in obtaining child pornography images/videos could open the BitTorrent website on his/her computer and conduct a keyword search for files using a term such as "preteen sex." The results of the search are returned to the user's computer and displayed on the torrent site. The user then selects a torrent from the results displayed which contain the file(s) the user wants to download. Once the torrent file is downloaded, the user's previously installed BitTorrent client program utilizes the torrent file to obtain the desired content on the network. The file is downloaded directly from the computer or computers sharing the file. The users can receive pieces of the selected file from numerous sources at once, or it can be from a single source. Once received, the pieces are then reassembled into the entire selected file. The downloaded file is stored in a folder previously designated by the user and/or the client program on the user's computer or designated external storage media or location on the user's computer. The downloaded file will remain until moved or deleted.

27. One of the advantages of P2P file sharing is that multiple files may be downloaded at the same time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a BitTorrent user downloading a movie file may actually receive

15

parts of the movie from multiple computers. The advantage of this is that it speeds up the time it takes to download the file. It is also possible to download the file or files from only one computer.

28. The BitTorrent Network bases its file shares on the Secure Hash Algorithm (SHA1). This mathematical algorithm allows for the digital identifier of data which can be represented by a series of letters and numbers unique to that piece of digital data. Once you check a file or files with a SHA1 hashing utility capable of generating this SHA1 value, that will be a fixed-length unique identifier for that file. The SHA1 is secure because it is computationally infeasible for two files with different content to have the same SHA1 hash value.

29. A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session. The IP address provides a unique location making it possible for data to be transferred between computers. Most P2P software does not display the IP address of the person sharing the file to the user. Third party software is available to identify the IP address of the P2P computer sharing a particular file.

30. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) can assign a different unique number to a computer when it accesses the internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the internet.

**BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE**

31. On or about December 8, 2023, I was conducting an online investigation on the BitTorrent network for offenders sharing "Child Pornography", (also known as "Child Sexual Abuse Material"). My attention was directed to IP Address 184.55.81.166 because it was

16

associated with a shared torrent which contained at least one file consistent with the definition of "Child Pornography", (also known as "Child Sexual Abuse Material").

32. Using a computer running the investigative BitTorrent software, a direct connection was made to the device at IP Address 184.55.81.166 on December 8, 2023, and a download was successfully completed of a file with the name "Stickam_caseface_(crozennn)0." The SHA1 hash value of the image was previously reported to the National Center for Missing and Exploited Children as containing an identified child. The device at IP Address 184.55.81.166 was the sole candidate for this download, and as such, this file was downloaded directly from this IP address to the computer running the investigative BitTorrent software. Based on your affiant's review of the file it is described as follows:

- A full color video approximately one minute and eleven seconds long which depicts a blonde-haired female facing a camera with a red flag and the title "crozennn" in green lettering overlaying the top left corner of the video. A brown box with the word "zoom" in white lettering overlaying the top right corner of the video. The female was approximately 11 to 15 years of age, with braces and wearing a thin strapped white tank top. During the video, the camera angled down to display that the child was not wearing clothing from the waist down. The child's vagina was visible. The video cut to an image of the child laying on her back, unclothed, visible from the bottom of her breast to her knee. The child was manipulating her vagina. The child had no visible pubic hair. The child's breasts appeared to be developing. The facial features and child's body development were consistent with a pubescent child.

33. The same image was observed to have been distributed from IP Address 184.55.81.166 (the previously identified IP address) on December 9, 2023, December 10, 2023, December 11, 2023, December 12, 2023, and December 16, 2023. Based on my training and experience, this means a device operating BitTorrent software from IP Address 184.55.81.166 maintained a copy of the image on storage within the device.

17

34. Using a computer running the investigative BitTorrent software, a direct connection was made to the device at IP Address 184.55.81.166 on December 8, 2023 and a download was successfully completed of a file with the name "baddance.flv ." The device at IP Address 184.55.81.166 was the sole candidate for this download at that time, and as such, this file was downloaded directly from this IP address to the computer running the investigative BitTorrent software. Based on your affiant's review of the file it is described as follows:

- a full color video approximately two minutes and twenty-four seconds long which depicts a room with blue walls and a bunk bed with a female child standing with her back to the camera. The girl had long blonde hair and was wearing white shorts and a light blue t-shirt. As the video progressed, the girl removed her clothing while dancing until fully nude. The girl sat on a chair and spread her legs with her vagina fully visible. The girl then stood and raised one leg with her hand, fully displaying her vagina. Based upon the girl's facial features, minimal breast development, lack of musculature, lack of pubic hair and body size, she appeared to be in the early stages of puberty. The child was approximately ten to fourteen years of age.

35. The same image was observed to have been distributed from IP Address 184.55.81.166 on December 10, 2023, December 11, 2023, December 12, 2023, December 15, 2023, and December 16, 2023. Based on my training and experience, this means a device operating BitTorrent software from IP Address 184.55.81.166 maintained a copy of the image on storage within the device.

36. On or about December 12, 2023, administrative subpoenas were served on Charter Communications Inc. (Charter), by an Operational Support Technician for the FBI, for subscriber information of the IP Address 184.55.81.166 on the dates December 8, 2023, through December 11, 2023. On or about December 15, 2023, Charter provided a response to the administrative subpoenas, which contained the following information:

a. Subscriber Name: STEVE REZMER

b. Address: 1203 42nd Avenue, KENOSHA, WI 53144 [SUBJECT PREMISES]

c. Lease Start Date: 06/12/2021 08:00 PM

37. On or about January 16, 2024, investigators conducted open-source research and determined that STEVEN REZMER was associated with the Racine Area Soccer Association as a coach and Director of Operations. JESSICA REZMER aka JESSICA CORCORAN was a Doctor of Osteopathic Medicine employed by Emergency Medicine Specialists in Milwaukee, WI.

38. On or about January 22, 2024, at approximately 7:54 a.m., FBI Special Agents who had familiarized themselves with the appearance of STEVEN REZMER and JESSICA REZMER conducted surveillance at the SUBJECT PREMISES and observed STEVEN REZMER (XX/XX/1978) depart the SUBJECT PREMISES, in a black Volkswagen Atlas (hereinafter, Atlas), bearing Wisconsin registration plate AFA-5808. The vehicle was registered to STEVEN and JESSICA REZMER. STEVEN REZMER traveled to Prairie School, 4050 Lighthouse Drive, Wind Point, WI, and appeared to enter the drop-off lane at the school. At approximately 2:09 p.m., JESSICA REZMER was observed departing the residence in the Atlas. No other residents or vehicles associated with the target residence were observed during this surveillance.

39. On or about January 24, 2024, at approximately 8:00 a.m., FBI Special Agents conducted surveillance at the SUBJECT PREMISES and observed STEVEN REZMER (XX/XX/1978) depart the residence in a brown Chevrolet Silverado (hereinafter, Silverado), bearing Wisconsin registration plate UB-3966. The vehicle was also registered to STEVEN and JESSICA REZMER. STEVEN REZMER traveled to the Prairie School in Wind Point, WI. No other residents or vehicles associated with the target residence were observed during this surveillance.

19

40. On or about May 22, 2024, at approximately 7:14 a.m., FBI Special Agents conducted surveillance at the SUBJECT PREMISES and observed a Volkswagen Atlas traveling toward the SUBJECT PREMISES on 41st Avenue in Kenosha, WI. At approximately 7:57 a.m., STEVEN REZMER was observed driving the Silverado North on 41st Avenue in Kenosha, WI in the area of the SUBJECT PREMISES. At approximately, 9:00 a.m., the Atlas was observed parked in the driveway of the SUBJECT PREMISES.

41. On or about May 23, 2024, at approximately 7:55 a.m., STEVEN REZMER was observed driving the Silverado on 41st Avenue in the area of the SUBJECT PREMISIES. At approximately 8:40 a.m., the Silverado was observed at the entrance to the Racine Area Soccer Association (hereinafter, RASA), 9509 Dunkelow Road, Franksville, WI. STEVEN REZMER exited the Silverado, opened the gate to the facility, then entered the facility in the Silverado and parked. STEVEN REZMER was then observed performing maintenance to the facility grounds.

42. On or about May 28, 2024, FBI Special Agents conducted surveillance at the SUBJECT PREMISES. At approximately 6:40 a.m., the Silverado was observed parked in the driveway of the SUBJECT PREMISES. At approximately 8:40 a.m., the Silverado pulled into the RASA entrance. STEVEN REZMER exited the Silverado, opened the gate to the facility, then entered the facility in the Silverado and parked. STEVEN REZMER and several other unidentified males then conducted maintenance on the facility grounds.

43. Based upon the above, particularly the fact that the IP Address that made the files available was registered to the SUBJECT PREMISES at the time of the uploads, it appears as though the uploads were made from a person at the SUBJECT PREMISES. Additionally, because the IP Address that made the images available was registered to STEVEN REZMER and he appears to still reside at the residence, I believe there is probable cause to believe that evidence of

the BitTorrent distributions will still be at the SUBJECT PREMISES or on the person of STEVEN REZMER and/or JESSICA REZMER.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

44. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a. Computers, cellular telephones, and other electronic storage devices (collectively electronic storage devices) have dramatically changed the way in which individuals interested in child pornography interact with each other. Electronic storage devices basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b. Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a device by simply connecting the camera to the electronic storage device. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store terabytes of data, which provides enough space to store thousands of high-resolution photographs. Video recorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the video recorder to a computer. Many electronic storage devices (e.g., computers, cellular telephones, and tablets), have cameras built into the device which allows users to create and store still and video images on the device. Moreover, if the device has internet connectivity, users can distribute still and video images from the device.

c. Internet-enabled electronic storage devices can connect to other internet-enabled devices the world over. The ability to produce child pornography easily, reproduce

21

it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to an internet-enabled electronic storage device. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, electronic storage devices are the preferred method of distribution and receipt of child pornographic materials.

d. Electronic storage devices are the ideal repository for child pornography. The amount of information that an electronic storage device can hold has grown exponentially over the last decade. Electronic storage devices can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on a computer or other electronic storage device. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Many electronic storage devices can easily be concealed and carried on an individual's person.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Google, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any internet-enabled electronic storage device. Even in cases where online storage is used,

22

however, evidence of child pornography can be found on the user's electronic storage device in most cases.

g. As is the case with most digital technology, communications by way of electronic storage device can be saved or stored on the device. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, electronic storage device user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

h. Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

45. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.

23

46. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

47. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who transport, distribute, receive, possess, and/or access with intent to view child pornography:

    a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

24

b.  Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.  Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

d.  Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools.  Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

e.  Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.  Such individuals prefer not to be without their child pornography for any prolonged period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.  Thus, even if an

25

individual, uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in the SUBJECT PREMISES, or a device located on STEVEN and/or JESSICA REZMER as set forth in Attachment A.

## CONCLUSION

48.     I respectfully request that this Court issue a search warrant for the location, and search of person described in Attachment A authorizing the seizure and search of the items described in Attachment B.

## <u>ATTACHMENT A</u>

### Property/Individuals to be Searched and Description of the Premises

1.      1203 42nd Avenue, Kenosha, WI: The property consists of a single-family residence. The residence is a multi-story home located in the north-east lot of a cul-de-sac. The residence has a brick exterior with the numbers "1203" written in black inset into a block between a two-car garage door and a single-car garage door. The residence has a combination of light brick walls and stone walls. The windows were trimmed in white with a dark shingled roof, and concrete driveway which extends to a step leading to the front door.  A black mailbox with "1203" affixed below the box is affixed to a black pole at 42nd Avenue, east of the driveway. The property to be searched includes the residence and all areas accessible to the residence, including any basement or crawl space areas; any curtilage associated with the residence.

2.      The person of STEVEN REZMER (XX/XX/1978) if he is present at the target residence.

3.      The Person of JESSICA REZMER (XX/XX/1977) if she is present at the target residence.

27

**ATTACHMENT B**

**Items to Be Seized**

The following materials, which constitute evidence of the commission of a criminal offense; contraband; the fruits of crime; or property designed, or intended for use, or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Section 2252:

1.    Cell phones, computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.    Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3.    Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

28

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of any device by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child

29

pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12. Any and all cameras, film, videotapes or other photographic equipment.

13. Any and all visual depictions of minors.

14. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce

by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

    e. evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence; \

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h. evidence of the times the electronic storage device was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

k. contextual information necessary to understand the evidence described in this attachment.

17. Records and things evidencing the use of the Internet Protocol addresses to communicate with the internet, including:

a. routers, modems, and network equipment used to connect electronic storage devices to the Internet;

b. records of Internet Protocol addresses used; and

c. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

32

During the execution of the search of the premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of STEVEN REZMER and/or JESSICA REZMER to the Touch ID sensor of device(s) or scan for facial recognition, such as an iPhone. Android, or Tablet, found at the premises for the purpose of attempting to unlock the device via fingerprint or facial recognition in order to search the contents as authorized by this warrant. If facial recognition is required, the subject(s) will remain still and look, with eyes open, at the camera for any devices seized in connection with this warrant for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.